# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
### WHITE PLAINS

| | |
|---|---|
| Thomas O'Leary, individually and on behalf of all others similarly situated, | 7:21-cv-08918 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| The Stop & Shop Supermarket Company LLC, | Jury Trial Demanded |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.    The Stop & Shop Supermarket Company LLC ("defendant") manufactures, labels, markets, and sells "High Potency Fish Oil" promising 448 mg EPA and 308 mg DHA, under the Nature's Promise brand ("Product").



2.     The essential omega-3 fatty acids that naturally occur in fish are Eicosapentaenoic Acid ("EPA") and Docosahexaenoic Acid ("DHA").

3.     In 2019, the global fish oil market was valued at $1.9 billion, and is currently estimated to reach $2.8 billion by 2027.

## I.     BENEFITS OF FISH OIL

4.     Fish is a major source of healthful long-chain omega-3 fats.

5.     Studies have shown that consuming fatty fish 2-3 times a week may reduce the risk of heart disease and stroke.

6.     Most Americans cannot, consume fatty fish with such regularity, and have instead turned to the consumption of fish oil to supplement their diets.

7.     Omega-3 fatty acids, including EPA and DHA, are found in a variety of fatty fish such menhaden, sardines, anchovies, salmon, and tuna.

## II.     HOW FISH OIL IS MADE

8.     Fish oil is made by a physical process, whereby fish are boiled, cooked, and pressed, separating the water and oil from proteins and solids, then separating the water from the oil.

9.     The oil is then polished, bleached, and deodorized before being encapsulated.

10.    The Omega-3 fatty acids in fish oil occur naturally in triglyceride form ("TAG").

11.    Triglyceride is the term used to define the molecular structure which bond these fatty acids (i.e., EPA and DHA) to a glycerol backbone.

12.    Depending on the type of fish from which oil was derived, the ratio of EPA and DHA can differ slightly, but typically will account for 30% of the fatty acid content (i.e.,180 mg of EPA and 120 mg of DHA per 1000 milligrams of oil).

13.    Standard fish oil is often referred to as "18:12," representing the typical ratio of EPA

to DHA by weight (18% of the oil by weight is EPA; and 12% of the oil by weight is DHA).

14.    The remaining 70% of the fish oil consists of saturated fats, other omega-3 fatty acids, omega-6 and omega-9 fatty acids.

## III.   PRODUCT IS NOT FISH OIL

15.    In the early 1980s, a company developed a large-scale the trans-esterification process to synthesize EPA and DHA from fish into an ethyl ester chemical form.

16.    This involves a chemical reaction to break down the glycerol backbone of each triglyceride molecule in fish oil, resulting in free fatty acids and a free glycerol molecule.

17.    The free fatty acid forms of EPA and DHA are chemically reacted with ethanol, followed by molecular distillation, resulting in an omega-3 ethyl ester solution.

18.    This process increases yields by 50% and allows lower quality fish oils to be used as starting materials.

19.    The fish oil is stripped of hundreds of its constituent components, and the Omega-3s, which include DHA and EPA, are converted into ethyl esters of fatty acids.

20.    The ethyl esters of fatty acids are different molecules than the Omega-3s, which exist naturally in fish oil.

21.    These compounds have the common or usual name of Omega-3 Fatty Acid Ethyl Esters.

22.    Omega-3 Fatty Acid Ethyl Esters are not found in nature.

23.    The concentration of omega-3s typically ranges from 50-70%.

24.    The constituent compounds are DHA Ethyl Esters and EPA Ethyl Esters, which are molecularly distinct from the precursor DHA and EPA triglyceride molecules.

25.    The trans-esterification process increases the levels of EPA-EE and DHA-EE beyond

the 18/12 limit of TAG EPA and TAG DHA in fish oil.

26.     Additionally, this process alters the natural ratios of DHA/EPA.

27.     Fish oil and omega-3 fatty acid ethyl esters are distinguishable on a molecular level with different weights, chemical structures, and physical properties.

28.     Global standards for fish oil products exist to prevent lower quality products from misleading consumers and allowing bad actors to gain an advantage against honest companies.

29.     The United States Pharmacopeia ("USP"), the Codex Alimentarius Committee and the Global Organization for EPA and DHA omega-3s ("GOED"), all distinguish between fish oil and trans-esterified products.

30.     The Product's representations are false, deceptive, and misleading, based on its EPA and DHA claims, and its purported common and usual name of "Fish Oil."

31.     The brand's name of "Nature's Promise," tells consumers like Plaintiff that they will be getting natural fish oil instead of a product which bears no resemblance to fish oil.

32.     The "High Potency" claim is also misleading because it fails to indicate a reference product such that consumers can adequately know, "high potency compared to what?"

## IV.   CONCLUSION

33.     A reasonable consumer would expect that the Product is fish oil, with the amount and quality of components indicated on the label, when this is not true.

34.     Consumers would not know that the Product is subject to processing which renders them distinct from fish oil.

35.     This knowledge would require investigation beyond the store aisle, which is outside of what the average consumer can be expected to know.

36.     Reasonable consumers must and do rely on a company to honestly identify and

describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

37.    By labeling the Product in this manner, Defendant gained an advantage against other companies, and against consumers seeking to purchase a product expected to be fish oil, contain the amount of compounds promised, and have a high potency.

38.    The value of the Product that plaintiff purchased was materially less than its value as represented by defendant.

39.    Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

40.    Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

41.    The Product is sold for a price premium compared to other similar products, no less than approximately $12.99 for a bottle of 90 capsules, a higher price than it would otherwise be sold for, absent the misleading representations and omissions.

<u>Jurisdiction and Venue</u>

42.    Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

43.    The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

44.    Plaintiff Thomas O'Leary is a citizen of New York.

45.    Defendant The Stop & Shop Supermarket Company LLC, is a Delaware limited liability company with a principal place of business in Quincy, Norfolk County, Massachusetts. and upon information and belief, at least one member of defendant is not a citizen of the same state

as the plaintiff.

46.    Defendant's sole member is Ahold Delhaize USA, Inc., a Delaware corporation with

a principal place of business in Quincy, Massachusetts

47.    Plaintiff and defendant are citizens of different states.

48.    Defendant transacts business within this district, through the marketing, supply, and

sales of its products at its approximately 80 stores within this state and sold online to citizens of

this state.

49.    Venue is in this district because plaintiff resides in this district and the actions giving

rise to the claims occurred within this district.

50.    Venue is in the White Plains Courthouse in this District because a substantial part of

the events or omissions giving rise to the claim occurred in Westchester County, i.e., Plaintiff's

purchase of the Products and his awareness of the issues described here.

<u>Parties</u>

51.    Plaintiff Thomas O'Leary is a citizen of Yonkers, Westchester County, New York.

52.    Plaintiff knows that fish oil has numerous benefits, and like most Americans, does

not consume enough fish, so he buys fish oil supplements.

53.    Defendant The Stop & Shop Supermarket Company LLC, is a Delaware limited

liability company with a principal place of business in Quincy, Massachusetts, Norfolk County.

54.    Defendant is a chain of supermarkets located in the northeastern United States – in

New York, New Jersey, Massachusetts, and Rhode Island.

55.    Defendant's brand is known for its honesty, going back to the days where it was the

neighborhood grocery store, far removed from the mega-supermarkets of today.

56.    Defendant's stores maintain that "neighborhood" quality, and it is reported that it has

the highest trust ratings among major supermarket chains.

57.    While Stop & Shop stores sell leading national brands, they sell a large number of products under one of their private label brands, Nature's Promise.

58.    Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

59.    Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

60.    Products under the Nature's Promise brand have an industry-wide reputation for quality and value.

61.    In releasing products under the Nature's Promise brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

62.    That Nature's Promise branded products met this high bar was proven by focus groups, which rated them above the name brand equivalent.

63.    Private label products generate higher profits for retailers because national brands spend significantly more on marketing, contributing to their higher prices.

64.     A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

65.    Private label products under the Nature's Promise brand benefit by their association with consumers' appreciation for the Stop & Shop brand as a whole.

66.    The development of private label items is a growth area for Stop & Shop, as they select only top suppliers to develop and produce Nature's Promise products.

67.    These facts show a company with a significant amount of goodwill and equity when

it comes to consumer purchasing.

68.   Plaintiff purchased the Products on one or more occasions within the statutes of limitations for each cause of action alleged, from  Defendant's stores, including the location at 111 Vredenburgh Ave, Yonkers, NY 10704, between April and May 2021, among other times.

69.   Plaintiff bought the Product because he expected it would be fish oil, contain the amount of compounds promised, and have a high potency because that is what the representations said and implied.

70.   Plaintiff relied on the words and images on the labels, identified here.

71.   Plaintiff bought the Product at or exceeding the above-referenced price.

72.   Plaintiff would not have purchased the Products if he knew the representations were false and misleading or would have paid less for them.

73.   Plaintiff chose between Defendant's Product and similar products represented similarly, but which did not misrepresent their attributes and/or lower-priced products which did not make the statements and claims made by Defendant.

74.   The Product was worth less than what Plaintiff paid and he would not have paid as much absent Defendant's false and misleading statements and omissions.

75.   Plaintiff intends to, seeks to, and will purchase the Product again when he can do so with the assurance that Product's representations are consistent with their composition.

76.   Plaintiff is unable to rely on the labeling of not only this Product, but other dietary supplements, because he is unsure of whether their representations are truthful.

77.   Plaintiff wants to purchase dietary supplements because he believes these contribute to his health and well-being.

## Class Allegations

78.    Plaintiff seeks certification under Fed. R. Civ. P. 23(b)(2) and (b)(3) of the following

classes:

> **New York Class:** All persons in the State of New York who
> purchased the Product during the statutes of limitations for
> each cause of action alleged.

79.    Common questions of law or fact predominate and include whether defendant's

representations were and are misleading and if plaintiff and class members are entitled to damages.

80.    Plaintiff's claims and basis for relief are typical to other members because all were

subjected to the same unfair and deceptive representations and actions.

81.    Plaintiff is an adequate representative because his interests do not conflict with other

members.

82.    No individual inquiry is necessary since the focus is only on defendant's practices

and the class is definable and ascertainable.

83.    Individual actions would risk inconsistent results, be repetitive and are impractical

to justify, as the claims are modest relative to the scope of the harm.

84.    Plaintiff's counsel is competent and experienced in complex class action litigation

and intends to protect class members' interests adequately and fairly.

85.    Plaintiff seeks class-wide injunctive relief because the practices continue.

## New York General Business Law ("GBL") §§ 349 & 350

## (Consumer Protection Statute)

86.    Plaintiff incorporates by reference all preceding paragraphs.

87.    Plaintiff and class members desired to purchase a product expected to be fish oil,

contain the amount of compounds promised, and have a high potency.

88. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

89. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

90. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

91. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

92. Plaintiff relied on the representations that the Product would be fish oil, contain the amount of compounds promised, and have a high potency

93. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Breaches of Express Warranty,</u>
<u>Implied Warranty of Merchantability and</u>
<u>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, <em>et seq</em>.</u>

94. The Product was manufactured, identified, and sold by defendant and expressly and impliedly warranted to plaintiff and class members that it was fish oil, contained the amount of compounds promised, and had a high potency.

95. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

96. This duty is based on Defendant's outsized role in the market as a trusted supermarket, as described above, which means consumers expect it to be different than other supermarkets without such a reputation.

97. Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers, and their employees.

98. Defendant received notice and should have been aware of these issues due to complaints by regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

99. The Product did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable because it was not fit to pass in the trade as advertised.

100. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Negligent Misrepresentation</u>

101. Defendant had a duty to truthfully represent the Product, which it breached.

102. This duty is based on defendant's position, holding itself out as having special knowledge and experience in this area, as a leading supermarket, known in the communities where it operates, with a history of over a century filling the nutritional needs of its customers.

103. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant, a leading grocer.

104. Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

105. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Fraud</u>

106. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it was fish oil, contained the amount of compounds promised, and had a high potency.

107.  Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provide it with actual and/or constructive knowledge of the falsity of the representations.

108.  Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

<u>Unjust Enrichment</u>

109.  Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1.  Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;

2.  Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3.  Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4.  Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5.  Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6.   Other and further relief as the Court deems just and proper.

Dated:   November 1, 2021

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan

60 Cuttermill Rd Ste 409
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com